UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

TAJENIK BYRD and TYREANA EDMONDS,

                    Plaintiffs,

    vs.                                5:23-cv-390
                                        (ECC/ML)

TOWN OF DEWITT POLICE OFFICER COREY
BUYCK, individually and in his official capacity,
TOWN OF DEWITT POLICE OFFICER RORY
SPAIN individually and in his official capacity,

                    Defendants.

---

**Appearances:**

Jeffrey S. Shelly, Esq., *for Plaintiffs*
Alexandra A. Calhoun, Esq., *for Defendants*

**Hon. Elizabeth C. Coombe, United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

Plaintiffs Tajenik Byrd and Tyreana Edmonds filed this action pursuant to 42 U.S.C. § 1983 against Defendants Dewitt Police Officers Corey Buyck and Rory Spain (Buyck and Spain) and others alleging Fourth and Fourteenth Amendment violations arising out of their July 4, 2021 arrest and subsequent prosecution. After a motion to dismiss, false arrest, malicious prosecution, and excessive force claims remain against Buyck and Spain. Presently before the Court are Defendants' motions for summary judgment, Dkt. No. 71, and to seal, Dkt. No. 66. The motions are fully briefed. Dkt. Nos. 66-7, 71-49, 74, 78. For the following reasons, Defendants' motion for summary judgment is granted, and Defendants' motion to seal is granted in part and denied in part.

## I.    BACKGROUND[1]

On July 4, 2021, Plaintiffs, who are sisters, went to a store in East Syracuse with Byrd's minor daughter, their minor nephew, and a dog.  Def. Stat. ¶¶ 4, 5, 30.  In the bike section, they encountered L.W.,[2] L.W.'s children, and a friend.  *Id.* at ¶ 9.  When Byrd encountered L.W., there was "a lot of commotion," with both sides raising their voices, and it got "loud to the point people were looking."  *Id.* at ¶ 12.  Byrd and L.W. were "basically in each other's faces," and Byrd sprayed L.W. with pepper spray that she carried in her purse.[3]  *Id.* at ¶¶ 16, 18, 20.  A store employee called 911, and store employees asked Plaintiffs to leave.  *Id.* at ¶¶ 23, 24.  According to Defendants, before Edmonds left the bike section, she struck three employees—S.R., J.J., and P.B.—in the

---

[1] The facts are drawn from the Defendants' Statement of Material Facts (Def. Stat.), Dkt. No. 71-49, and Plaintiffs' Response to Defendants' Statement of Material Facts (Pl. Resp.), Dkt. No. 74-1, to the extent they are supported by pinpoint citations to the record, and the exhibits that the parties have submitted.  Disputed facts are noted.  The facts are construed in the light most favorable to Plaintiff as the non-moving party.  *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).  Portions of the underlying incident were recorded by Spain's body-worn camera, Dkt. Nos. 71-41 (Spain Bodycam N), 71-44 (Spain Bodycam Q); Buyck's body-worn camera, Dkt. No. 71-22 (Buyck Bodycam); a bystander's cellphone, Dkt. No. 71-24 (Bystander Video); the store's fisheye security camera, Dkt. No. 71-23 (Fisheye Video); and the store's security camera in its bike section, Dkt. No. 71-26 (Bike Video).  To the extent any party's characterization of material facts conflicts with what is "clearly show[n]" in the body worn camera footage, the Court will consider these facts effectively undisputed.  *See Crespo v. City of New York*, No. 22-cv-2693, 2025 WL 1311035, at *1 (E.D.N.Y. May 6, 2025) ("when a party's version of the facts is discredited by a video recording, a court should accept the video recording on a summary judgment motion") (citing *Scott v. Harris*, 550 U.S. 372 (2007)).  The Fisheye Video submitted by Defendants consists of a store video that was merged with the audio from Buyck's bodycam video.  Dkt. No. 71-17 ¶ 15.  Plaintiff argues that the resulting exhibit could not be submitted in admissible form, and thus is not appropriately considered on the motion for summary judgment.  It is not necessary to address this argument, because the Court does not rely on the synchronization.  Finally, unless otherwise noted, citations to page numbers refer to pagination generated by the Court's ECF system.

[2] Byrd's daughter shares a father with L.W.'s son.  Def. Stat. ¶ 11.

[3] According to Byrd, she sprayed pepper spray in self-defense.  Pl. Resp. ¶ 21.

2

face, and she kicked S.R.  Def. Stat. ¶¶ 25–28.  *See also* Bike Video at 5:50–6:50.  At a minimum, the video evidence depicts Edmonds striking at least one of these employees in the face.  Bike Video at 6:25-6:33.

At approximately 4:54 p.m., a dispatcher directed Defendants Buyck and Spain to go to the store, told them that "there were five to six females fighting and threatening management," and told them that "there was possible mace involved."  Def. Stat. ¶¶ 30, 33, 35.  Spain arrived at the store in uniform at approximately 4:58 p.m. and talked to M.W., an employee he knew from earlier interactions with the store.  *Id.* at ¶¶ 36–39.  M.W. told Spain, "This female pushed our one manager right in the face, she literally kicked our other manager," pointed at Edmonds who was wearing a black top, and explained that she was "right down there in the black, right straight ahead."  *Id.* at ¶¶ 7, 41, 42.  M.W. also stated that Edmonds "was breaking shit and everything else," "there was mention of mace," and "other females were fighting."  *Id.* at ¶¶ 43–44.

When Spain approached Edmonds, she was yelling at store employees and using profanity.  Def. Stat. ¶¶ 45–47.  Spain saw Edmonds "right up against" J.L., a male employee who was between Edmonds and a store manager, S.R.  *Id.* at ¶¶ 48–49, 50, 173.  Spain also heard Edmonds yell at S.R., "I didn't touch you, bitch."  *Id.* at ¶¶ 49, 52.  S.R. responded, "You kicked me[,] and you hit me in my face."  *Id.* at ¶ 53.

Spain "took hold of" Edmonds's arms.  Def. Stat. ¶ 56.  As he did this, Byrd approached and pulled on Edmonds's left arm and yelled repeatedly, "Get off my sister" and "get your hands off."  *Id.* at ¶¶ 57–59; Spain Bodycam N at 1:11–1:35.  Spain told Byrd to "back off" twelve times, and said, "You're about to get detained too."  *Id.* at ¶¶ 61–62.  Edmonds repeatedly told Spain, "You can cuff me."  Def. Stat. ¶ 65.  Approximately 30 seconds after Spain grabbed Edmonds's

arms, Byrd "walked away, in the direction of the exit," and Spain handcuffed Edmonds. *Id.* at ¶¶ 63, 66; Spain Bodycam N at 1:11–1:42. When Edmonds asked why she was being detained, Spain said, "Right now, harassment." Def. Stat. ¶ 69.

When an employee stated that someone had been sprayed with mace, Edmonds said, "because 'they' jumped my sister just two days ago; they hurt my sister." Def. Stat. ¶ 70; Spain Bodycam N at 2:05-2:10. A bystander "pointed to [Byrd] and identified [her] to [Spain] as the person who had sprayed mace." *Id.* at ¶¶ 71, 72; Spain Bodycam N at 2:08–2:15. As Spain led Edmonds toward the exit, she stated, twice, to him, "I would beat your ass." Spain Bodycam N at 2:40-2:50.

Buyck arrived at the store in his uniform at approximately 5:00 P.M., and saw Spain escorting Edmonds in handcuffs. Def. Stat. ¶¶ 75–76, 77. Spain told Buyck "to detain the woman in white." *Id.* at ¶ 78. Byrd was wearing a white dress. *Id.* at ¶ 7.

Buyck approached Byrd and said, "Come on, ma'am, put your hands behind your back." Def. Stat. ¶ 79. Buyck "repeatedly attempted to secure Byrd's arms, and Byrd "repeatedly pulled her arms" and "backed away" from Buyck. *Id.* at ¶¶ 80–82. Byrd also yelled, "No. My daughter is right here. Get off of me. And yo. Get the fuck off of me. Get off." *Id.* at ¶ 83. Buyck told Byrd to put her hands behind her back before she held "up a dog leash and yelled 'I can't. You see the dog?'" *Id.* at ¶ 84. Buyck again told Byrd to put her hands behind her back "or you're gonna get on the ground." *Id.* at ¶ 86. Byrd screamed, "'Get off of me. I'm pregnant. Get off.'" *Id.* at ¶ 87. "Byrd continued to struggle against [Buyck] and attempted to pull her arm out of his grip." *Id.* at ¶ 88. Buyck told Byrd "multiple times to put her hands behind her back," and she continued struggle while saying, "No, I'm not doin' shit." *Id.* at ¶¶ 89, 91. Buyck "attempted to

gain control" of Byrd's "arms for approximately fifty seconds" and "told her to put her hands behind her back at least seven times." Def. Stat. ¶¶ 97–99; Fisheye Video at 00:45–1:33. During this time, "a crowd began to form." *Id.* at ¶ 112.

Buyck took Byrd to the ground while yelling "you're making a big scene right now, do you understand me?" Buyck Bodycam at 1:29–1:33. Buyck pinned Byrd to the ground "with his right leg over her legs[] and attempted to place her into handcuffs." Def. Stat. ¶ 106. Byrd repeatedly tried to move Byrd's hands behind her back, and Byrd repeatedly yelled, "Tase me," and, "Record this." *Id.* at ¶¶ 109–111; Fisheye Video at 1:33–3:10.

The parties concede that the situation became "hostile" once Buyck took Byrd to the ground, due to the crowd that had formed. Def. Stat. ¶ 113. "Several people in the crowd used their cell phones to make recordings." *Id.* at ¶ 120. Plaintiffs' mother, who had arrived at the store, yelled at Buyck. *Id.* at ¶ 121; *see* Bystander Video at 00:10–00:16. A man in the crowd approached Defendants and yelled at them. *Id.* at ¶¶ 122, 125. Spain "unholstered his taser," and held it in his left hand while he continued to control Edmonds with his right hand. *Id.* at ¶¶ 128, 130. Spain told the man to step back. *Id.* at ¶ 131. Spain and Buyck "requested additional units because the crowd was growing and appeared to be getting more agitated." *Id.* at ¶ 132.

When Edmonds became aware that Buyck was attempting to detain Byrd, Edmonds turned toward them and "repeatedly yelled 'my sister's pregnant,'" "began struggling against" Spain's hold, and knocked merchandise off a shelf. Def. Stat. ¶¶ 101–02; Fisheye Video at 00:45–1:03. After Buyck took Byrd to the ground, Edmonds repeatedly yelled "she's pregnant." Def. Stat. at ¶ 105. The parties dispute whether Spain "slammed" Edmonds to the ground. *Compare* Def. Stat. ¶ 115 *with* Pl. Resp. ¶ 115. After Edmonds was on the ground, she repeatedly yelled, "'She's

5

pregnant,' and struggled against" Spain. Def. Stat. ¶ 114; Buyck Bodycam at 1:40-1:48. Spain got Edmonds on her feet. Def. Stat. ¶ 117. Edmonds "used her foot to strike out towards" Buyck, "kicked over a display of plastic bins," and some of the bins struck store employees, Buyck, and Byrd. *Id.* at ¶¶ 119, 123; Bystander Video at 00:15–00:22.

Edmonds again "went down to the ground[] or was placed on the ground by" Spain. Def. Stat. ¶ 133. While Edmonds was on the ground, she kicked S.R., and Spain used his right hand to pull her back. *Id.* at ¶¶ 136–38. Spain stood and pulled Edmonds by her handcuffed hands for less than two seconds. Bystander Video at 1:17–1:20; Def. Stat. ¶ 139. Spain then knelt on Edmonds's lower back and put the taser in his holster. Bystander Video at 1:20–1:39.

At this point, approximately two minutes after Buyck took Byrd to the ground, Buyck stood the now handcuffed Byrd up. Def. Stat. ¶ 141; Bystander Video at 1:18–1:20; Fisheye Video at 1:33-3:24. Byrd's dress was pushed up, exposing her buttocks and underwear. Bystander Video at 1:21. Buyck led Byrd to the exit. Def. Stat. ¶¶ 143, 144.

Immediately before Buyck led Byrd away, Edmonds attempted to kick Buyck from the ground. Bystander Video at 1:35-1:40. Spain immediately "picked up" Edmonds by holding her right calf and her hands and "started carrying her toward the exit." Def. Stat. ¶ 145; Bystander Video at 1:40–1:44. Her skirt came up exposing her underwear. *Id.* Spain "lost his grip on" Edmonds, "and put her down on her feet, and started leading her to the exit by her arms." Def. Stat. ¶ 146. By this point, another DeWitt police officer had arrived at the store. Fisheye Video at 3:49–3:51; *see* Def. Stat. ¶ 161.

Defendants contend, and the video evidence depicts, that Edmonds continued to scream at and struggle against Spain. Def. Stat. ¶ 147; Bystander Video at 1:40-1:51. In the course of Spain

attempting to lead Edmonds out of the store, Edmonds turned to Spain, yelled "Get off my sister," and, the Defendants contend, attempted to bite Spain's right arm. Def. Stat. ¶¶ 148-52; *see also* Bystander Video at 1:47-1:51. Plaintiffs deny that Edmonds attempted to bite Spain. Pl. Resp. ¶¶ 148–52. Spain "jerked his right arm away from" Edmonds' mouth and "immediately struck" her "in the face with a closed right fist to her left jaw area." *Id.* at ¶ 154; Bystander Video at 1:50-1:60. "Spain's strike caused" Edmonds "to fall to the ground," and Spain was able to regain control.[4] Def. Stat. ¶¶ 155, 156. Spain and the other DeWitt police officer "escorted" Edmonds out of the store and put her into a police car. *Id.* at ¶ 162. Buyck "escorted" Byrd out of the store and put her into a police car. *Id.* at ¶ 163. The police seized "OC-17 Brand Magnum Defense Spray" and "a handheld conducted energy weapon" from Edmonds. *Id.* at ¶ 185–86. The police also seized "Back Off Brand Dog Repellant" from Byrd. *Id.* at ¶ 187.

After the Plaintiffs were removed from the store, Spain interviewed two women, including L.W., who "appeared to be in severe pain from having been sprayed with mace." Def. Stat. ¶¶ 165-66; Spain Bodycam Q at 1:45, 15:10. According to the woman with L.W., Byrd sprayed them and two young children with mace. *Id.* at ¶ 167. L.W.'s minor daughter told Spain, "My tongue is still burning." *Id.* at ¶ 170. Spain also interviewed S.R., who stated that Edmonds had "struck her in the face to push her away" and kicked her. *Id.* at ¶¶ 175, 178. She also stated that Edmonds struck Employee J.J. "in the face to push her away" and slapped Employee P.B. *Id.* at ¶¶ 176–77. Employee P.B. stated that (1) Edmonds hit her in the face and pushed her away, (2) "the woman

---

[4] The parties dispute whether Buyck escorted Byrd back into the store after Spain struck Edmonds. *Compare* Def. Stat. ¶ 160 *with* Pl. Resp. ¶ 160. Video shows that Buyck and Byrd were near the exit when they returned to Spain and Edmonds. Fisheye Video at 4:08–4:10.

in the white dress pepper sprayed" another woman, and (3) Plaintiffs damaged 11 items of property worth $84.64. *Id.* at ¶ 180–84.

Edmonds was transported to the DeWitt Police Department station and released later that day with an appearance ticket. Def. Stat. ¶ 189. Byrd, who was pregnant at the time, was transported to a hospital for evaluation where a doctor told her that "she had bleeding by her placenta, which was seen on sonogram." *Id.* at ¶¶ 196, 209-10, 212. "[H]er right side was 'crampy' when she got home from the hospital" that night. *Id.* at ¶ 213. When she "followed up with her physician and had another sonogram, there was no more bleeding," and no other test showed bleeding. *Id.* at ¶¶ 214–15. Byrd had bruises on both wrists that lasted about a week," and the soreness in her wrists "went away after about three days." *Id.* at ¶¶ 220–21. Byrd also had a bruise on her leg that "went away within the week," and the soreness "went away in a couple of days." *Id.* at ¶ 224. In 2022, Byrd had a baby boy. *Id.* at ¶ 218.

Edmonds had a "'speed knot' on her forehead and below her left eyelid" that lasted a week and a half. Def. Stat. ¶¶ 226, 227. Edmonds also had bruising on both wrists. *Id.* at ¶ 228. Edmonds went to the hospital two or three days after her arrest, and "they told her that her wrist was 'just bruised' and that she 'could' have a concussion." *Id.* at ¶ 229.

Edmonds was charged with (1) attempted assault in the second degree, in violation of New York Penal Law § 120.05(3), (2) obstructing government administration in the second degree, in violation of New York Penal Law § 195.05, (3) resisting arrest, in violation of New York Penal Law § 205.30, (4) criminal mischief in the fourth degree, in violation of New York Penal Law § 145.00(1), (5) disorderly conduct, in violation of New York Penal Law § 240.20(1), and (6) harassment in the second degree, in violation of New York Penal Law § 240.26(1). Def. Stat.

¶¶ 190–95.

Byrd was charged with (1) assault in the third degree, in violation of New York Penal Law § 120.00(1), (2) obstructing government administration in the second degree in violation of New York Penal Law § 195.05, (3) resisting arrest, in violation of New York Penal Law § 205.30, (4) endangering the welfare of a child, in violation of New York Penal Law § 260.10(1), (5) criminal possession of a weapon in the fourth degree, in violation of New York Penal Law § 265.01(2), (6) unlawfully possessing or selling noxious material, in violation of New York Penal Law § 270.05(2), (7) disorderly conduct, in violation of New York Penal Law § 240.20(1), and (8) harassment in the second degree, in violation of New York Penal Law § 240.26(1). Def. Stat. ¶¶ 198–205.

Buyck did not sign the arrest reports, appearance tickets, or the charging documents for Edmonds and Byrd. Def. Stat. ¶¶ 206–07. The criminal charges against Plaintiffs were dismissed. *See* Dkt. No. 71-13 at 211:5–24.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation and quotation omitted); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is material if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S.

9

at 248; *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim") (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)). If the moving party meets this burden, the nonmoving party must "set forth specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250 (citation and quotation omitted); *see Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Courts should accordingly view "the facts in the light depicted by the videotape." *Id.* at 380–81.

In addition, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature

of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Further, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## III.    DISCUSSION

### A.    Official Capacity Claims

Defendants argue that Plaintiffs' official capacity claims should be dismissed because the *Monell* claims against the Town of Dewitt were dismissed. Defendants' Memorandum of Law (Def. Mem.) at 34–35, Dkt. No. 71-50. Plaintiffs respond that they have new evidence—Spain's subsequent similar use of force—that provides a viable municipal liability claim relying on a failure-to-train theory. Plaintiffs' Memorandum of Law (Pl. Mem.) at 11 n.3, Dkt. No. 74.

Plaintiffs' municipal liability claim was previously dismissed. Dkt. No. 32 at 29–32. Even assuming, however, that it had not been dismissed, municipal liability relying on a failure-to-train theory requires a pattern of earlier violations, unless the "unconstitutional consequences of failing to train" are "patently obvious." *Connick v. Thompson*, 563 U.S. 51, 64 (2011). Where, as here, there is nothing to support that the consequences would be so obvious, a "plaintiff cannot point to 'contemporaneous or subsequent' violations to 'establish a pattern of violations.'"[5] *Greene v. City of New York*, 742 F. App'x 532, 536–37 (2d Cir. 2018) (quoting *Connick*, 563 U.S. at 63 n.7); *see Thomas v. City of Troy*, 293 F. Supp. 3d 282, 298 (N.D.N.Y. 2018) (explaining that the plaintiff's reliance on two cases where the defendants allegedly violated the constitutional rights of

---

[5] Plaintiff does not argue that liability should be based on a single incident.

11

individuals under similar circumstances, but "well after the alleged constitutional violations that occurred here," meant that the plaintiff did not state a *Monell* claim), *on reconsideration sub nom. Thomas v. Mason*, No. 1:17-cv-626 (DJS), 2019 WL 6111572 (N.D.N.Y. Nov. 18, 2019). Accordingly, Plaintiffs' evidence of Spain's subsequent use of similar force could not resurrect a failure-to-train claim in this case. Summary judgment is therefore granted on the official-capacity claims.

### B.      False Arrest

Defendants argue that they are entitled to summary judgment on the false arrest claims because probable cause existed to arrest both Edmonds and Byrd for disorderly conduct and other charges based on the collective knowledge doctrine. Def. Mem. at 9–12. Plaintiffs respond that Defendants did not believe that they had probable cause, and they were not aware of facts that would establish probable cause until after the arrests. Pl. Mem. at 10–11. Plaintiffs also argue that Spain did not communicate to Buyck the facts necessary for probable cause to arrest Byrd. *Id.*

To establish a § 1983 claim for false arrest, a plaintiff must demonstrate that: (1) "the [o]fficers intended to confine" him, (2) he was "conscious of the confinement and did not consent to it," and (3) "the confinement was not otherwise privileged." *Berg v. Kelly*, 897 F.3d 99, 106 (2d Cir. 2018) (citing *Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003)). The existence of probable cause defeats a false arrest claim. *See Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021). For a false arrest claim, courts "focus on the validity of the arrest, and not on the validity of each charge." *Jaegly v. Couch,* 439 F.3d 149, 154 (2d Cir. 2006) (emphasis omitted). In other words, "a claim for false arrest turns only on whether probable cause existed to arrest," and "it is not relevant whether probable cause existed with respect to each individual

12

charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Id.*

"To determine whether an officer had probable cause for an arrest," courts "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 583 U.S. 48, 56–57 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)) (additional quotation and citation omitted). Probable cause "depends on the totality of the circumstances." *Pringle*, 540 U.S. at 371.

"An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jaegly*, 439 F.3d at 152 (quotation and citation omitted). Probable cause does not require that the "belief that a person has committed a crime be correct or more likely true than false." *Mara v. Rilling*, 921 F.3d 48, 69 (2d Cir. 2019) (quotation and citation omitted). "It requires only facts sufficient to establish the sort of fair probability on which reasonable and prudent people, not legal technicians, act." *Id.* (quotation and citation omitted).

Further, when "making a probable cause determination, police officers are entitled to rely on the allegations of fellow police officers." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (quotation omitted). "The determination of probable cause does not turn on whether the [fellow officer's] observations were accurate but on whether [the arresting officer] was reasonable in relying on those observations." *Id*. Finally, "where law enforcement authorities are cooperating in an investigation . . . the knowledge of one is presumed shared by all." *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003) (alteration in original) (quoting *Illinois v. Andreas*, 463 U.S.

13

765, 772 n.5 (1983)).  Accordingly, under the "collective or imputed knowledge doctrine, an arrest . . . is permissible where the actual arresting . . . officer lacks the specific information to form the basis for probable cause . . . but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001).

Here, Defendants are entitled to summary judgment on Plaintiffs' false arrest claims if the arresting officers knew sufficient facts at the time of the arrest to objectively provide probable cause to arrest Plaintiffs for disorderly conduct, in violation of New York Penal Law § 240.20.[6] A person is guilty of disorderly conduct when she "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . engages in fighting or in violent, tumultuous or threatening behavior."  N.Y. Penal Law § 240.20.

Regarding Edmonds, the totality of the facts establishes probable cause for disorderly conduct.  First, a dispatcher told Spain that someone reported that women were fighting and threatening management in the store.  Second, when Spain arrived at the store, an employee told him that women had been fighting and Edmonds—who he pointed out—struck employees.  Third, Spain watched Edmonds yell and swear at employees as well as stand "right up against" an

---

[6] Relying on Spain's testimony that probable cause did not exist to arrest Plaintiffs when he seized them, Plaintiffs argue that Defendants did not "present any fact or evidence that Defendants actually possessed the requisite information" necessary for probable cause or cite to any "fact, evidence, or testimony that either Defendant *in fact* believed they had "reasonable suspicion" or "probable cause" *at the time they accosted the Plaintiffs*." *Id.* at 7.  Contrary to Plaintiffs' arguments, the subjective beliefs of arresting officers regarding the existence of probable cause are irrelevant. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").  *See also Wesby*, 583 U.S. at 67 (determining the availability of qualified immunity based on what would "have been clear to every reasonable officer" in the same circumstances).

14

employee.  Fourth, Spain heard another employee tell Edmonds, "You kicked me[,] and you hit me in my face."  Def. Stat. ¶¶ 33, 34, 38–50, 52–53.  This was sufficient to objectively provide probable cause to arrest Edmonds for disorderly conduct.

Regarding Byrd, in addition to the information from the dispatcher—that someone reported that women were fighting and threatening management in the store—both an employee and a bystander told Spain that Byrd sprayed mace at another woman, and Spain watched Byrd try to pull Edmonds's arm out of Spain's grip.  Def. Stat. ¶¶ 57–59, 70–72.  Given that knowledge of these facts is imputed to Buyck even if Spain did not communicate them to Buyck, *see Colon,* 250 F.3d at 135, Buyck had probable cause to arrest Byrd for disorderly conduct.  Defendants' motion for summary judgment on the false arrest claims is therefore granted.

In the alternative, Defendants are entitled to summary judgment based on the qualified immunity doctrine because, at a minimum, they had arguable probable cause to arrest Plaintiffs for disorderly conduct.  Police officers are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *Wesby*, 583 U.S. at 63 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "The qualified immunity defense, thus, is a broad shield that protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017) (quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013)).

An officer "is entitled to qualified immunity against a suit for false arrest if he can establish that he had arguable probable cause to arrest the plaintiff."  *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2014) (quotation and citation omitted).  "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of

15

reasonable competence could disagree on whether the probable cause test was met." *Id.* (quotation and citation omitted).

Even if, as explained above, the officers did not have probable cause to arrest Plaintiffs, the same facts supporting the probable cause analysis would provide arguable probable cause, and they would be entitled to qualified immunity. *See Garcia*, 779 F.3d at 92 (noting that qualified immunity is available when "officers of reasonable competence could disagree on whether the probable cause test was met"). Defendants are therefore entitled to summary judgment on Plaintiffs' false arrest claims.

### C.    Malicious Prosecution

Defendants argue that summary judgment on the malicious prosecution claims is appropriate because, among other reasons, they had probable cause to prosecute each offense. Def. Mem. at 18–24. Plaintiffs respond that Defendants lacked probable cause at the time of arrest and never "substantiate[d] 'probable cause.'" Pl. Mem. at 10 n.1.

To establish a malicious prosecution claim, a plaintiff must prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (quotations and citations omitted). A § 1983 malicious prosecution claim also requires a plaintiff to "demonstrate a 'sufficient post-arraignment liberty restraint.'" *Kee v. City of New York*, 12 F.4th 150, 162 (2d Cir. 2021) (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)).

Probable cause to commence the proceeding must be shown "for each crime charged," and

16

therefore "should not be conflated with probable cause to arrest." *Kee*, 12 F.4th at 166 (citing *Posr v. Ct. Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999)); *see Chiaverini v. City of Napoleon*, 602 U.S. 556, 562 (2024) (explaining that "courts should evaluate" malicious prosecution suits "charge by charge"). The "existence of probable cause is a complete defense to a malicious prosecution claim." *Cornelio v. Connecticut*, 32 F.4th 160, 178–79 (2d Cir. 2022). In addition, an "officer is entitled to qualified immunity on claims of . . . malicious prosecution where he had arguable probable cause to . . . prosecute." *Bornschein v. Herman*, 304 F. Supp. 3d 296, 303 (N.D.N.Y. 2018) (quotation and citations omitted).

Viewing the evidence in the lights most favorable to Plaintiffs, Defendants had probable cause, or arguable probable cause, to prosecute Plaintiffs for each crime.

### 1.    Disorderly Conduct – Edmonds and Byrd

A person is guilty of disorderly conduct when she "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . engages in fighting or in violent, tumultuous or threatening behavior." N.Y. Penal Law § 240.20. As previously discussed in the false arrest analysis, there was probable cause, or at least arguable probable cause, to arrest both Edmonds and Byrd for disorderly conduct, and the facts supporting those conclusions also provide probable cause for their prosecutions for disorderly conduct. *See* Def. Stat. ¶¶ 33, 34, 38–50, 52–53 (detailing information possessed by the officers including the dispatcher's report that women were fighting and threatening management in the store, the employee's statement to Spain that women were fighting and that employee's identification of Edmonds as the woman who struck employees by pointing her out; Edmonds' behavior including yelling, swearing, and standing "right up against" a store employee; and a store employee's statement to Edmonds, "You

17

kicked me and you hit me in my face."); Def. Stat. ¶¶ 57–59, 70–72 (detailing information possessed by the officers including the dispatcher's report that women were fighting and threatening store management, that Spain heard from a store employee and a bystander that Byrd had sprayed mace at another woman, that Spain personally observed Byrd trying to pull Edmonds's arm out of his grip, the store security video reviewed by the Defendants, and the statements that L.W., her children and her friend gave to the Defendants).

### 2.     Harassment in the Second Degree – Edmonds and Byrd

A person is guilty of harassment in the second degree, "when, with intent to harass, annoy or alarm another person . . . she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same." N.Y. Penal Law § 240.26(1).  Here, the facts establishing probable cause to arrest Edmonds and Byrd for disorderly conduct also provide probable cause, or at least arguable probable cause, to prosecute them for this offense. *See* Def. Stat. ¶¶ 33, 34, 38–50, 52–53 (detailing information possessed by the officers including the dispatcher's report that women were fighting and threatening management in the store, the employee's statement to Spain that women were fighting and that employee's identification of Edmonds as the woman who struck employees by pointing her out; Edmonds' behavior including yelling, swearing, and standing "right up against" a store employee; and a store employee's statement to Edmonds, "You kicked me and you hit me in my face."); Def. Stat. ¶¶ 57–59, 70–72 (detailing information possessed by the officers including the dispatcher's report that women were fighting and threatening store management, that Spain heard from a store employee and a bystander that Byrd had sprayed mace at another woman, that Spain personally observed Byrd trying to pull Edmonds's arm out of his grip, the store security video showing that Byrd sprayed

18

something, and statements that L.W., her children and her friend gave to the Defendants).

### 3.      Obstructing Governmental Administration – Edmonds and Byrd

A person is guilty of obstructing governmental administration, "when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference. . . ."  N.Y. Penal Law § 195.05.  Here, Edmonds physically struggled to prevent Spain from arresting her and to prevent Buyck from arresting Byrd. Def. Stat. at ¶¶ 100–02.  This is sufficient to establish probable cause for this offense.  *See In re Davan L.*, 91 N.Y.2d 88, 91 (1997) (noting that New York Penal Law § 195.05 was "enacted [so] that criminal responsibility should attach to minimal interference set in motion to frustrate police activity").  In the alternative, Defendants had arguable probable cause because "reasonable officers could at least debate whether there was probable cause" to prosecute plaintiff "for obstructing governmental administration." *Kass*, 864 F.3d at 210; *see id.* at 209–210 (concluding that officers were entitled to qualified immunity for obstructing governmental administration arrest where the plaintiff refused "officers' repeated orders" to move away from a barricade and told an officer to "get [his] hands off" him and pulled away).

Defendants also had probable cause to prosecute Byrd because they were present when Byrd tried to pull Edmonds from Spain's grasp and tried to pull her own hands away from her back and out of Buyck's grasp.  Def Stat. ¶¶ 57-59, 88, 91. In the alternative, Defendants had arguable probable cause because "reasonable officers could at least debate whether there was probable cause" to prosecute plaintiff "for obstructing governmental administration."  *Kass*, 864 F.3d at 210.

19

### 4.  Resisting Arrest – Edmonds and Byrd

A person is guilty of resisting arrest  "when he intentionally prevents or attempts to prevent a police officer . . . from effecting an authorized arrest of himself or another person."  N.Y. Penal Law § 205.30.  Here, Defendants had probable cause, or at least arguable probable cause, to prosecute Edmonds because they were present when Edmonds struggled physically to prevent both her arrest and Byrd's arrest.  Def. Stat. ¶¶ 100–03, 114, 116-18.  Defendants also had probable cause, or at least arguable probable cause, to prosecute Byrd because they were present when Byrd struggled physically to prevent Edmonds's arrest by pulling on Edmonds, and to prevent her own arrest by trying to pull her hands away from her back and out of Buyck's grip.  Def Stat. ¶¶ 57-59, 88, 91.

### 5.  Attempted Assault in the Second Degree – Edmonds

A person is guilty of attempted assault in the second degree when one attempts to "[w]ith intent to prevent . . . a police officer . . . from performing a lawful duty . . . cause[] physical injury to such . . . police officer." N.Y. Penal Law § 120.05(3); *see* N.Y. Penal Law § 110.00 ("A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime.").  Although the parties dispute whether Edmonds attempted to bite Spain, the Court need not resolve that issue, because the Bystander Video shows that Edmonds took actions that a reasonable officer could construe as an attempt to bite Spain while Spain was lawfully arresting her.  Bystander Video at 1:48–1:50.  As a result, Defendants had probable cause, or at least arguable probable cause, to prosecute for this offense.

### 6.    Criminal Mischief in the Fourth Degree – Edmonds

A person is guilty of criminal mischief in the fourth degree "when, having no right to do so nor any reasonable ground to believe that he or she has such right, he or she . . . [i]ntentionally damages property of another person." N.Y. Penal Law § 145.00(1). Here, Defendants had probable cause to prosecute Edmonds because they were present when Edmonds damaged store property, and a store employee stated that Edmonds damaged store property worth $84.64. Def. Stat. ¶ 182. This is sufficient to establish probable cause for this offense.

### 7.    Assault in the Third Degree – Byrd

A person is guilty of assault in the third degree "when . . . [w]ith intent to cause physical injury to another person, he causes such injury to such person or a third person." N.Y. Penal Law § 120.00(1). Here, Defendants had probable cause to prosecute Byrd for this offense based on (1) the statements that they obtained including a store employee's statement that Byrd sprayed mace at another woman, and the interviews of the people who stated that Byrd sprayed them as well as the dog spray seized from Byrd, Def. Stat. ¶¶ 164–87, (2) the security video reviewed by Buyck showing that Byrd sprayed something at L.W. and her children, Dkt. No. 71-14 at 94:19–24, and (3) the statement Edmonds made as she walked by an employee who stated that someone had been sprayed with mace: "because 'they' jumped my sister just two days ago; they hurt my sister." Def. Stat. ¶ 70; Spain Bodycam N at 2:05-2:10.

### 8.    Endangering the Welfare of a Child – Byrd

A person is guilty of endangering the welfare of a child "when . . . she knowingly acts in a manner likely to be injurious to the physical . . . welfare of a child less than seventeen years old." N.Y. Penal Law § 260.10(1). Here, there was probable cause to prosecute Byrd based on (1) the

21

videos reviewed by the officers showing that Byrd sprayed something at L.W. while her children were next to her; (2) the statement from the woman with L.W. that Byrd sprayed mace at, among others, L.W's children; and (3) the statement from one of L.W.'s children that "My tongue is still burning." Def. Stat. ¶ 170.

### 9.    Unlawful Possession of Noxious Material and Criminal Possession of a Weapon in the Fourth Degree – Byrd

A person is guilty of unlawful possession or sale of noxious material[7] when "he possesses such material under circumstances evincing an intent to use it or to cause it to be used to inflict physical injury upon or to cause annoyance to a person . . . or to disturb the public peace." N.Y. Penal Law § 270.05(2).

Here, Defendants had significant evidence that Byrd possessed a self-defense spray including (1) a store employee's statement that Byrd sprayed mace at another woman, (2) statements from people who said that Byrd sprayed them, (3) the dog spray seized from Byrd, Def. Stat. ¶¶ 164–87, (4) the video of L.W. after the incident, Spain Bodycam Q 1:45, 15:10, (5) the security video reviewed by Buyck showing that Byrd sprayed something at L.W. and her children, Dkt. No. 71-14 at 94:19–24, and (6) Edmonds' statement that "'they' jumped my sister just two days ago; they hurt my sister," made after an employee stated that someone had been sprayed with mace, Def. Stat. ¶ 70-72; Spain Bodycam N at 2:05-2:10.

To the extent that Plaintiffs' assertion that Byrd acted in self-defense is an argument that Byrd possessed the spray to protect herself, Defendants are still entitled to summary judgment on

---

[7] A noxious material is defined as "any container which contains any . . . substance capable of generating offensive, noxious or suffocating fumes, gases or vapors." N.Y. Penal Law § 270.05(1).

the false prosecution claim relating to this offense. "Self-defense spray devices are not prohibited," and "it shall not be unlawful for a person eighteen years of age or older to possess a self-defense spray as defined in [N.Y. Penal Law § 265.20(a)(14)] in accordance with the provisions set forth therein." Penal Law § 270.05(5). Section 265.20(a)(14) states that there is an exemption for a self-defense spray "for the protection of a person or property." [8] N.Y. Penal Law § 265.20(a)(14). As one commentator explained, the "cross-reference to Penal Law § 265.20 can produce some confusion because in listing the exemptions as they relate to self-defense sprays, the statute sets forth exceptions to those exemptions," and "it is in the exemptions, and the exceptions to those exemptions, that we must toil to learn what is lawful with respect to the possession of a self-defense spray." Donnino, Practice Commentary, McKinney's Cons. Laws of N.Y., Book 39, Penal Law § 270.05(5).

The parties provided no cases clearly establishing that the exemption is an element of the offense, not a defense, and the Court has not found any. In addition to the absence of such law, "it is well established that a police officer aware of facts creating probable cause to suspect a prima facie violation of a criminal statute is 'not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.'" Garcia, 779 F.3d at 93 (quoting Curley v. Vill. of Suffern, 268 F.3d 65, 70 (2d Cir. 2001)). "Whether or not a suspect ultimately turns out to have a defense, or even whether a reasonable officer might have some idea that such a defense could exist, is not the question." Id. at 96 (citing Curley, 268 F.3d at 70). Rather, an "officer still has probable cause to arrest, and certainly is entitled to qualified immunity, so long as any such

---

[8] The spray must also be approved by the New York State Department of Health, and the person may not have an prior felony or assault convictions. N.Y. Penal Law §§ 265.20(a)(14)(b)(ii), (iii).

defense rests on . . . a legal theory that is not so clearly established, that it cannot be said that any reasonable officer would understand that an arrest under the circumstances would be unlawful." *Id.* (citing *Reichle*, 566 U.S. at 664).

As a result, even if the exception is an element and not a defense, Defendants are entitled to qualified immunity because "officers of reasonable competence could disagree on whether the probable cause test was met," and there was at least arguable probable cause. *Garcia*, 779 F.3d at 92.

### 10.    Criminal Possession of a Weapon in the Fourth Degree – Byrd

A person is guilty of criminal possession of a weapon in the fourth degree "when . . . she possesses any . . . dangerous or deadly instrument or weapon with intent to use the same unlawfully against another."  N.Y. Penal Law § 265.01(2).  A "dangerous instrument" is "any instrument, article or substance, . . . which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury."  N.Y. Penal Law § 10.00(13).  New York courts have concluded that pepper spray and mace qualify as dangerous instruments when they are operable.  *People v. Wilkerson*, 711 N.Y.S.2d 308, 310 (N.Y. Crim. Ct. 2000); *see People v. McCullum*, 706 N.Y.S.2d 616, 619 (N.Y. Crim. Ct. 2000) ("if the mace cannister is operable, it is a dangerous instrument").

Unlike possession of noxious material, this statute does not include language regarding self-defense.  There is, however, still the exception provided by N.Y. Penal Law § 265.20(a)(14), and it applies to use of a "self-defense spray device under circumstances which would justify the use of physical force."  The exemption is therefore a defense, like the license exemption for criminal possession of a weapon, and "it presumptively operates as a 'proviso that need not be

pleaded but may be raised by the accused as a bar to prosecution or a defense at trial.'" *People v. David*, 41 N.Y.3d 90, 96 (2023) (quoting *People v. Santana*, 7 N.Y.3d 234, 236 (2006)) (additional citations omitted).

Here, the officers had significant evidence that Byrd used a mace-like spray including (1) a store employee's statement that Byrd sprayed mace at another woman, (2) statements from people who said they Byrd sprayed them, (3) the physical reaction of L.W., (4) the dog spray seized from Byrd, Def. Stat. ¶¶ 164–87, (5) the security video reviewed by Buyck showing that Byrd sprayed something at L.W. and her children, Dkt. No. 71-14 at 94:19–24, and (6) Edmonds' statement that she made after an employee stated that someone had been sprayed with mace explaining that it was "because 'they' jumped my sister just two days ago; they hurt my sister." Def. Stat. ¶¶ 70-72; Spain Bodycam N at 2:05-2:10.

Given that the officers did not have to eliminate every potential defense, there was probable cause, or at least arguable probable cause, to prosecute each Plaintiff for each offense, and Defendants' motion for summary judgment on the malicious prosecution claims is therefore granted.

### D.    Excessive Force

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Whether the force used by an arresting officer was excessive is determined by an objective balancing test where "the nature and quality of the intrusion on the plaintiff's Fourth

25

Amendment interests" is balanced "against the countervailing governmental interests at stake." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).

At least three factors guide this determination: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy*, 623 F.3d at 96 (citing *Graham*, 490 U.S. at 396). This requires analysis of the totality of the circumstances and "the history of the interaction, as well as other past circumstances known to the officer . . . may inform the reasonableness of the use of force." *Barnes v. Felix*, 605 U.S. 73, 80–81 (2025).

Nonetheless, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "Such calculus accounts for the well-worn axiom that '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'" *White v. LaRusch,* No. 18-cv-1245, 2022 WL 4287661, at *9 (W.D.N.Y. June 1, 2022), *report and recommendation adopted*, 2022 WL 3655184 (W.D.N.Y. Aug. 25, 2022) (quoting *Graham,* 490 U.S. at 396) (citations omitted)).

"Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could

26

conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

As an initial matter, to the extent that Plaintiffs rely on an absence of probable cause for their arrests to support their excessive force claims, that argument fails because, as discussed in the false arrest analysis, Defendants had probable cause to arrest Plaintiffs for, at a minimum, disorderly conduct.

### 1.    Byrd

Defendants seek summary judgment on Byrd's excessive force claim against Buyck, arguing that Buyck's actions in taking Byrd to the ground were reasonable because (1) Byrd had been resisting Buyck's efforts to handcuff her for nearly a minute, during which time Byrd was pulling her arms away, backing away from him, and screaming, among other things, "No," "Get off me," "Get the fuck off of me," "Get off;" (2) the manner in which Buyck took Byrd to the ground was not excessive, but proportional and responsive to Byrd's resistance; (3) Byrd's claim that Buyck put his elbow into her right side while she was on the ground is not consistent with the video evidence and does not support her excessive force claim; [9] (4) Edmond's pregnancy does not impact the analysis of the excessive force claim; and (5) Buyck is alternatively entitled to qualified immunity.  Def. Mem. at 28-31, 34-36.  Plaintiffs' only reference to Byrd's excessive force claim in opposition to the Defendants' motion is that "Buyck slammed Byrd to the ground even though Edmonds had been telling Buyck that Byrd was pregnant . . . and Byrd herself told Buyck she was pregnant."  Pl. Mem. at 5 (record citations omitted).

---

[9] The Amended Complaint alleges that "[w]hile Byrd was being dragged across the floor, one of the Officers' elbows was pressed on Byrd's belly, causing internal bleeding[.]"  Amended Complaint ¶ 14, Dkt. No. 33.

Applying the first *Graham* factor, Byrd was charged with minor crimes that were at most misdemeanors, "which are generally treated as less serious crimes under the *Graham* analysis." *Williams v. City of New York*, No. 1:23-cv-02936, 2025 WL 2381569, at *7 (S.D.N.Y. Aug. 15, 2025) (collecting cases), *appeal dismissed*, No. 25-2119, 2025 WL 4481259 (2d Cir. Dec. 29, 2025). Accordingly, this factor weighs slightly in Byrd's favor.

As to the second *Graham* factor, "courts assessing the threat to officer safety look both to the officers' statements about their perception of a threat and objective factors that would justify such a fear." *Scoma v. City of New York*, No. 16-cv-06693, 2021 WL 230295, at *8 (E.D.N.Y. Jan. 22, 2021) (citation omitted). Here, Buyck was dispatched to a "fight" in progress, Def. Stat. ¶ 30, with information that there were "five to six females fighting and threatening management," with "no weapons seen" but "possible mace involved." Def. Stat. ¶¶ 30, 33, 35; Dkt. No. 71-18 at 00:00-00:20. Byrd's subsequent conduct–physically resisting being placed in handcuffs, struggling against Buyck, and cursing and screaming at the officers–coupled with that of Edmonds, resulted in a crowd forming, with multiple bystanders also screaming and threatening the officers. Under the circumstances, a reasonable officer could have perceived Byrd's conduct as creating an immediate threat to his or her safety. *Tracy*, 623 F.3d at 97 (reasonable officer could believe that a plaintiff who struggled with the arresting officer posed a "real and imminent" risk to officer safety); *see also Parker v. Santos*, No. 19-cv-06945, 2024 WL 4243663, at *9 (E.D.N.Y. Aug. 15, 2024) (reasonable officer could believe that the arrestees "abrasive and threatening behavior" posed a threat), *report and recommendation adopted*, 2019 WL 13540727 (E.D.N.Y. Sep. 10, 2024).

Finally, as to the third *Graham* factor, Byrd was undisputedly resisting arrest. "Resisting arrest includes a range of resistance, from 'purely passive' resistance, such as demonstrators chaining themselves together and covering their hands with maple syrup to make arrest more difficult, or refusing to offer one's hands for handcuffing, to 'active resistance,' such as fleeing, physically attacking an officer, or even making a move that an officer could reasonably interpret as threatening an attack [ ]." *Williams,* 2025 WL 2381569, at *8 (internal quotation marks and citations omitted). Here, in response to Buyck's directive to put her hands behind her back, Byrd swore at Buyck; stated repeatedly, in so many words, that she would not comply with Buyck's instructions; and tried to pull out of Buyck's grip; clearly resisting Buyck's efforts. Buyck did not take Byrd to the ground until after he "told her to put her hands behind her back at least seven times," Def. Stat. ¶ 99, and Byrd had actively resisted arrest by pulling her arms away from Buyck and refusing his commands for approximately 50 seconds. Fisheye Video at 0:45–1:35; Buyck Bodycam at 0:45–1:35. Immediately before taking Byrd to the ground, Buyck warned her to "put your hands behind your back or you're gonna get on the ground." Def. Stat. ¶ 86. Buyck employed a "hug arm bar" technique to take her to the ground. Once Byrd was on the ground, Buyck knelt on her legs and pushed her down toward the ground in order to get her hands behind her back. Byrd was also, at least initially while on the ground, resisting Buyck's efforts to put her hands behind her back, rolling over, and screaming "tase me" at Buyck. Buyck can be observed holding Byrd's arm against the side of her stomach while restraining her on the ground. Buyck eventually placed Byrd in handcuffs on the ground, and stood her up, at which time she continued to pull away from and argue with Buyck. The video evidence depicts Buyck leading Byrd, still pulling away from him, out of the store.

Under these circumstances, Buyck's restraint of Byrd was not unreasonable, and therefore not unconstitutionally excessive. As a general matter, the law is clear that Buyck was justified to use *some* degree of force to restrain Byrd, given her resistance. The "fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of some degree of force, but it does not give the officer license to use force without limit." *Sullivan v. Gagnier*, 225 F.3d 161, 165–66 (2d Cir. 2000). Other district courts in this circuit have granted summary judgment in cases involving misdemeanor crimes and comparable, if not greater, force. *See, e.g.*, *Brayshaw v. City of Burlington*, No. 13-cv-253, 2015 WL 1523019, at *2 (D. Vt. Apr. 3, 2015) (granting summary judgment for the officer where the officer's "imperfect arm bar takedown," resulted in significant injuries when the plaintiff's "head . . . hit the pavement" during resistance of a disorderly conduct arrest, because "use of the arm bar takedown was reasonable under the circumstances"); *Williams,* 2025 WL 2381569 at *9 (same where the officer fired a taser for a misdemeanor arrest because although the "the crimes at issue were relatively nonsevere, a reasonable officer could have perceived Plaintiff to pose an imminent threat to the safety of officers and others, and he was actively resisting arrest by struggling with the officers as they tried to handcuff him."). Likewise, an assessment of the *Graham* factors and other relevant circumstances in this case shows that Buyck's conduct did not exceed the limits of permissive force when restraining a resisting arrestee.

Plaintiffs contend that Byrd's pregnancy otherwise renders Buyck's use of force unreasonable. At the outset, Byrd's initial contentions about her conduct throughout the incident, and the force applied against her, are inconsistent with the remainder of the summary judgment record. At her 50-H hearing, Byrd testified that once Buyck took her to the ground, she was laying

30

still and not resisting.  Dkt. No. 71-9 at 50-51.  She further testified that as she lay there, Buyck "was using full force, putting his elbow" in her right side.  *Id.* at 47. This is inconsistent with her allegation in the complaint that she was dragged across the floor with an officer's elbow pressed against her stomach.  Nevertheless, as previously set forth neither of these versions of the events are supported by the undisputed facts and video evidence contained in the summary judgment record.

The Court is skeptical that Plaintiff's pregnancy alters the excessive force analysis in this instance, particularly where Buyck gave Plaintiff ample opportunity to comply with his directive that she put her hands behind her back before taking her to the ground in order to apply handcuffs, and the limited amount of force he used to take her to the ground and once on the ground.  *See Mejia v. City of New York*, 119 F. Supp. 2d 232, 249, 282 (E.D.N.Y. 2000) (noting that "there would be nothing unreasonable" about physically removing plaintiff, who was three-months pregnant at the time, from a car, except that the defendant officer lacked probable cause); *Lin v. City of New York*, No. 14-cv-9994, 2016 WL 7439362, at *11 (S.D.N.Y. Dec. 21, 2016) (granting summary judgment for defendant officers who used "the minimum [force] needed to arrest [the pregnant plaintiff], place her into handcuffs, and take her to the police van").

Nevertheless, even assuming a reasonable juror could conclude that Buyck used excessive force to restrain and subdue Byrd, he is entitled to qualified immunity on this claim.  As previously discussed, qualified immunity "'shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Soukaneh v. Andrzejewski,* 112 F.4th 107, 116 (2d Cir. 2024) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)); *see Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006) (explaining

31

that "[q]ualified immunity shields police officers acting in their official capacity from suits for damages unless their actions violate clearly-established rights of which an objectively reasonable official would have known." (citation modified)). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Matusak v. Daminski*, 165 F.4th 702, 712 (2d Cir. 2026) (quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (in turn quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))).  As the Supreme Court recently reiterated in the Fourth Amendment context,

> To find that a right is clearly established, courts generally "need to identify a case where an officer acting under similar circumstances . . . was held to have violated" the Constitution. *Escondido v. Emmons*, 586 U.S. 38, 43, 139 S.Ct. 500, 202 L.Ed.2d 455 (2019) (per curiam) (internal quotation marks omitted). The relevant precedent must define the right with a "high degree of specificity," so that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 583 U.S. 48, 63, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018) (internal quotation marks omitted). Principles stated generally, such as that "an officer may not use unreasonable and excessive force," do not suffice. *Kisela v. Hughes*, 584 U.S. 100, 105, 138 S.Ct. 1148, 200 L.Ed.2d 449 (2018) (per curiam). In short, officers receive qualified immunity unless they could have "read" the relevant precedent beforehand and "know[ n]" that it proscribed their specific conduct. *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 616, 135 S.Ct. 1765, 191 L.Ed.2d 856 (2015).

*Zorn v. Linton*, 607 U.S. ____, No. 25–297, 2026 WL 795469, at *2 (U.S. Mar. 23, 2026).

Here, Plaintiffs have not identified any case where the Supreme Court or Second Circuit has concluded that an officer violates the Constitution in similar circumstances when he takes an aggressive, resisting, pregnant arrestee to the ground to effect a lawful arrest, particularly after having given a verbal warning that continued resistance would result in such a consequence. Accordingly, because "existing precedent has not placed the . . . constitutional question beyond

32

debate," *al-Kidd*, 563 U.S. at 741, summary judgment is granted to Defendants on Byrd's excessive force claim against Buyck.

### 2.    Edmonds

Defendants seek summary judgment on Edmonds excessive force claims against Spain, arguing that (1) Spain's conduct restraining Edmonds before striking her in the face cannot support an excessive force claim because it was not unreasonable; (2) striking Edmonds in the face was an immediate, limited, and proportional self-defense response to eliminate the physical threat that Edmonds posed to Spain in attempting to bite him, and was not excessive; and (3) Spain is alternatively entitled to qualified immunity.  Def. Mem. at 33-36.  Plaintiffs oppose the motion, arguing that Spain "could have avoided punching Edmonds" by taking other more reasonable actions, such as "escorting her properly," or "simply pull[ing] Edmonds to the ground."  Pl. Mem. at 9-10.

To the extent Edmond's claim is based on Spain's conduct before striking her in the face, Spain is entitled to summary judgment for substantially the same reasons articulated in the analysis of Byrd's excessive force claim.  To be sure, Spain was justified to use some degree of force in his continuing attempt to restrain and subdue the restrained but resisting Edmonds as she thrashed her body, kicked at merchandise and another officer, and made threats.  On the record before this Court, no reasonable jury could conclude that Spain's conduct in this context amounted to "a degree of force beyond that which is warranted by the objective circumstances of [the] arrest." *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019); *see also LaFever v. Clarke*, 525 F. Supp. 3d 305, 333 (N.D.N.Y. 2021) ("no reasonable jury could find in LaFever's favor on this excessive force claim" alleging officers "tackled her, rolled her on the floor, threw her against the

33

walls, and then dragged her out of the room" where the undisputed facts establish "that LaFever acted aggressively during the *entirety* of the police encounter" and "continued to resist even after she was handcuffed.").

Plaintiffs ask this Court to consider Edmonds' attempt to bite Spain to be a genuinely disputed fact precluding summary judgment. For several reasons, the Court declines to do so. First, upon review of the video evidence, the Court is skeptical that any reasonable juror could conclude that Edmonds did not attempt to bite Spain in the arm. To suggest otherwise strains credulity. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the [video] record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Even so, the appropriate inquiry in evaluating whether force is reasonable is "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Jones*, 465 F.3d at 61 (quoting *Graham*, 490 U.S. at 396). Thus, based on the summary judgment record before this Court, including the video evidence and affidavits, there can be no genuine dispute that Spain at least had a reasonable belief that Edmonds was attempting to bite him.

Accordingly, the proper inquiry under the *Graham* factors is whether it was unconstitutionally excessive for Spain to strike Edmonds in the face while she was handcuffed, but continuously resisting arrest, and immediately after he perceived her attempt to bite him in the arm. At the outset, the caselaw in this Circuit suggests that "punching" a resisting and physically threatening arrestee, even in the face, is not per se unreasonable. *See Rivera v. City of Yonkers*, 470 F. Supp. 2d 402, 407 (S.D.N.Y. 2007) (a hard punch to plaintiff's jaw, which resulted in

34

significant injury, found reasonable where "[f]ollowing an extended pursuit of a vehicle that was driving erratically and endangering the safety of civilians and police officers, Plaintiff, . . . was flailing his arms and taking swings at [defendant]."); *McKenzie v. City of New York*, No. 18 Civ. 6913, 2021 WL 3375613, at *6 (S.D.N.Y. Feb. 26, 2021), *report and recommendation adopted*, 2021 WL 2894164 (S.D.N.Y. July 2, 2021) ("It was . . . reasonable for Cross to increase his use of force in attempting to subdue McKenzie by punching him [three or four times in the face]."); *see also Jennings v. Decker*, 359 F. Supp. 3d 196, 206 (N.D.N.Y. 2019) (noting that Defendants' account that "Plaintiff fled from Decker and continued to resist arrest until after Ettinger punched him [in the face]" "might support the dismissal of Plaintiff's excessive force claim."). Here, the added factor that Edmonds was in handcuffs at the time is relevant in considering whether the application of significant force was excessive. However, to the extent Edmonds was physically resisting and presented a physical threat to Spain despite being in handcuffs, it was likely reasonable for Spain to use significant force against her. *See LaFever*, 525 F. Supp. 3d at 333 (granting summary judgment where significant force applied to subdue handcuffed arrestee because no reasonable jury could conclude "that plaintiff was subjected to 'significant force' *at a time that she was no longer 'actively resisting.'*") (citation omitted and emphasis added); *Davis v. City of Leesburg,* No. 5:12-cv-609, 2014 WL 4926143, at *17 (M.D. Fla. Sept. 30, 2014) (officers did not use any more force than necessary to subdue handcuffed Plaintiff when he "smashed" her face into the floor, breaking three of her teeth, immediately after she attempted to bite one of the officers in the leg).

Ultimately, the Court need not determine whether Spain violated Edmonds' Fourth Amendment rights, because Spain is nevertheless entitled to qualified immunity. At the time of

35

the underlying incident, it was clearly established "that a police officer cannot use significant force against an individual where that individual does not pose an immediate threat to the safety of others or is not actively resisting arrest or attempting to evade arrest by flight." *Singh v. City of New York*, No. 23-24-CV, 2024 WL 319117, at *7 (2d Cir. Jan. 29, 2024). Clearly established law further made it "impermissible to use significant force against a restrained arrestee who is not actively resisting." *Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020). Here, however, the admitted facts do not fall within the parameters of this "clearly established" law: Edmonds was acting aggressively throughout the majority of her encounter with Spain, and continuously physically resisted Spain's attempts to detain her, even after she was handcuffed. She also posed an immediate physical threat to Spain when she suddenly attempted to bite him.

The Court has canvassed the relevant authority, and is unable to find a decision holding that a law enforcement officer, "acting under similar circumstances . . . was held to have violated the Constitution." *Zorn*, 2026 WL 795469, at *2 (cleaned up). That is, that a law enforcement officer, faced with a handcuffed but physically violent and resisting arrestee attempting to bite him in the arm, violates the Constitution by striking her once in the face. Accordingly, Edmonds' excessive force claim against Spain is dismissed.

### E.    Motion to Seal

Defendants filed an unopposed motion to seal the audio and video recordings filed with their motion for summary judgment. Dkt. No. 66. The Defendants argue that these recordings contain "multiple dates of birth, the names of minor children, . . . the home addresses of Plaintiff Tyreana Edmonds and multiple witnesses [and,] . . . the faces of multiple minor children, who could be easily identified based upon their relationship to the Plaintiffs, or to [another] witness,"

36

and that it would be "impossib[le]" to redact these exhibits to comply with Federal Rule of Civil Procedure 5.2(a) and Local Rule 5.2(a).  Defendants' Memorandum of Law on Motion to Seal (Seal Mem.) at 3–4, Dkt. No. 66-7.

Rule 5.3 of the Local Rules of Practice for the Northern District of New York requires a "party seeking to have a document, a portion of a document, a party or an entire case sealed bears the burden of filing an application setting forth the reason(s) that the referenced material should be sealed under the governing legal standard."  Courts in the Second Circuit use a three-step process to determine whether a document may be sealed.  *See Lugosch v. Pyramid Corp. of Onondaga Cnty.*, 435 F.3d 110, 119–20 (2d Cir. 2006).  First, the court must determine whether the documents are "judicial documents" to which a presumption of access attaches.  *Id.* at 119.  A "judicial document" is a document which is "relevant to the performance of the judicial function and useful in the judicial process."  *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995).  Second, if the subject documents are judicial documents, the court must then determine the weight of presumption of access.  *Lugosch*, 435 F.3d at 119.  The presumption of access is stronger when the document at issue involves the adjudication of the litigants' substantive rights.  *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995).  The presumption weakens "where the filing with the court is unusual or generally under seal." *Id.* at 1050.  Third, the court balances "competing considerations" against the weight of presumption of access.  *Lugosch*, 435 F.3d at 120 (quotation and citation omitted).  Such considerations include "the danger of impairing law enforcement or judicial efficiency" and "the privacy interests of those resisting disclosure." *Amodeo*, 71 F.3d at 1050–51.

Here, the documents are judicial documents because they were submitted in support of a

motion for summary judgment, and there is a strong presumption of access. *See Brown v. Maxwell*, 929 F.3d 41, 48 (2d Cir. 2019) (holding district court erred when if did not "give proper weight to the presumption of access that attaches to documents filed in connection with summary judgment motions"). On the other hand, the portions of the exhibits containing witness interviews include information that should be redacted such as dates of birth, home addresses, and, for the minor children, identifying information. *See* Federal Rule of Civil Procedure 5.2(a) and Local Rule 5.2(a). Given the Defendants' representations that it would be time consuming, difficult, and expensive to redact those interviews, and the fact that the public's interest in those materials is not as strong as their interest in the exhibits depicting the events as they occurred, the motion to seal the exhibits is granted as to the portion of those videos containing witness interviews. *See Amodeo,* 71 F.3d at 1050–51. The motion to seal is otherwise denied.

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment pursuant to Rule 56, Dkt. No. 71, is **GRANTED**, and Plaintiffs' amended complaint is **DISMISSED with prejudice**; and it is further

**ORDERED** that Defendants' motion to seal, Dkt. No. 66, is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that, to the extent set forth above, the relevant portions of the following motion exhibits shall be filed under seal:

(1) Buyck Ex. E [Dkt. No. 71-22];

(2) Buyck Ex. F [Dkt. No. 71-23];

38

(3) Spain Ex. Q [Dkt. No. 71-44]; and it is further

**ORDERED** that Defendants' motion to seal is in all other respects **DENIED;** and it is

further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: March 31, 2026

_____

Elizabeth C. Coombe
U.S. District Judge